UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JESSE RUSSELL SIMPSON, *Plaintiff*, v. NICOLE COLBERT, *et al*., *Defendants*. | Civil Action No. 1:21-cv-00479 (CJN) |

**MEMORANDUM OPINION**

Jesse Russell Simpson alleges that the District of Columbia and various employees of the D.C. Jail unlawfully denied him certain religious accommodations while he was incarcerated there. Defendants move to dismiss on all claims and for partial summary judgment as to Simpson's common law claims against the District. *See* ECF No. 22. For the reasons stated below, the Court grants in part and denies in part Defendants' Motion.

**I.     Background**

Simpson was incarcerated at the D.C. Jail for just over two months in the fall of 2020. *See* Am. Compl., ECF No. 13-1 at 9, 18. During that period, he was a practitioner of Orthodox Therian Shamanism, a religion "with similar beliefs to many Native American and Animism religions." *Id*. at 3. This religion, Simpson alleges, requires him to "wear an imitation Wolf tail, . . . display Wolf imagery in his living quarters and mediate regularly around imagery of Wolves," in order to gain "the powers of animals" and avoid "eternal damnation." *Id*. It "also requires him to maintain a vegan and sustainably sourced diet and refrain from touching or handling animal products." *Id*.

1

Simpson alleges that he was denied religious accommodations during his detention. His primary complaints relate to his diet. He alleges that he "was not provided food he could eat for 41 of the first 48 meals while he was at D.C. Jail," as a result of which he experienced "constant hunger and extreme physical and mental discomfort," losing over 10 pounds. *Id*. at 19. He also claims he was also unable to possess wolf paraphernalia, including a wolf tail and wolf imagery.

Simpson's amended complaint describes in detail the process by which he requested dietary accommodations. In general, he would first ask staff at the cafeteria for a vegan meal. If that did not happen, he was directed either to fill out a sick call form or to send a request form to the Chaplain's Office asking for religious accommodations. *See* Amended Compl., ECF No. 13-1 at 10–11. In the event that the Chaplain's Office denied such a request, he would file with the Warden an emergency grievance or an appeal of that denial. *Id*. at 11. All told, he submitted at least two sick call forms, three requests for religious accommodations, four emergency grievances, and five appeals. Toward the end of his detention, he was generally provided with the meals he requested.

In February 2021, Simpson filed this action *pro se*. After the resolution of various preliminary matters, his amended complaint currently asserts claims against the District of Columbia, Warden Lennard Johnson, Supervisory Chaplain Nicole Colbert, Reverend Keith Venson, and certain unnamed D.C. Jail staff under 42 U.S.C. § 1983 (for violations of his First, Fifth, and Eighth Amendment rights), and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb, *et seq*.; against Colbert and Venson under 42 U.S.C. § 1985(3); and against all defendants under various common law theories.

Defendants move to dismiss all claims and for partial summary judgment on Simpson's common-law claims (on the ground that he failed to provide them with statutorily required notice before filing suit). *See* ECF No. 22.

## II. Analysis

### A. The District of Columbia

#### 1. RFRA Claims

In 1993, Congress passed the Religious Freedom Restoration Act (RFRA) to "provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). RFRA provides that "[g]overnments shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb–1(a), (b); *see also id*. at § 2000cc–1(a). A person whose religious exercise has been burdened "may assert that violation as a claim . . . in a judicial proceeding and obtain appropriate relief against a government." *Id*. at § 2000bb–1(c). RFRA applies to the District of Columbia. *Id*. at § 2000bb–2(2).

The District acknowledges that it is subject to RFRA, but contends that it has not waived sovereign immunity for damages claims under RFRA. Simpson's only response is that the District, as a "covered entity," can be made to give "all appropriate relief" under the statute. *See* Pl. Memo in Opp. to Mot. to Dismiss, ECF No. 23 at 5.

The District is correct. A plaintiff cannot pursue damages from the District of Columbia without an express waiver of sovereign immunity from Congress. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983); *see also Anderson v. Carter*, 802 F.3d 4, 8 (D.C. Cir. 2015); *see Metro. R. Co. v. District of Columbia*, 132 U.S. 1, 9 (1889) ("[T]he sovereign power of this

3

qualified state is not lodged in the corporation of the District of Columbia, but in the government of the United States."). Courts must "strictly construe[]" any waiver of sovereign immunity, "in terms of its scope, in favor of the sovereign." *Lane v. Peña*, 518 U.S. 187, 192 (1996). RFRA does not contain a clear, unambiguous waiver of sovereign immunity for money damages, whether as to the United States, *see Webman v. Fed. Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C. Cir. 2006), or the District of Columbia. Simpson's RFRA damages claims against the District must therefore be dismissed.

### 2.   Section 1983

Courts assess § 1983 claims against municipalities (including the District of Columbia) under a two-step process. First, a court must determine whether the complaint states a plausible claim for a predicate constitutional violation. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 124 (1992)). Then, the court must decide whether the complaint states a plausible claim that the constitutional violation was caused by a custom or policy of the municipality. *Id*.

Defendants do not contest (for purposes of their Motion) that Simpson adequately alleges violations of the First and Fifth Amendments. But they do argue that Simpson has failed adequately to allege municipal liability for those claims. And they argue that Simpson has failed to allege an Eighth Amendment violation.

#### a.   Eighth Amendment

The Eighth Amendment prohibits governments from inflicting "cruel and unusual punishments." *See* U.S. CONST., amend. VIII. Prison conditions are generally subject to Eighth Amendment scrutiny. *See Helling v. McKinney*, 509 U.S. 25, 32 (1993). Severe prison conditions qualify as violations of the Eighth Amendment if they include "deprivations of essential food, medical care, or sanitation[,] or . . . increase[d] violence among inmates." *Rhodes*

*v. Chapman,* 452 U.S. 337, 348 (1981).  The deprivation must be so severe that it violates "the minimal civilized measure of life's necessities."  *See Women Prisoners*, 93 F.3d at 928 (quoting *Inmates of Occoquan v. Barry*, 844 F.2d 828, 839 (D.C. Cir. 1988)).  And prison officials must have a "sufficiently culpable state of mind," including one of "deliberate indifference to inmate health or safety."  *See Famer*, 511 U.S. at 833.

Simpson's amended complaint does not allege an Eighth Amendment violation.  To be sure, the Jail was obliged to provide Simpson with edible meals and put its best efforts towards meeting his dietary restrictions.  It did just that:  it provided him with edible meals, which Simpson refused to eat (sometimes) because they contained non-vegan ingredients, such as turkey, eggs, or cheese.  Eventually those proteins were replaced with peanut butter packets.  This alleged conduct falls very well short of the kind of grievous treatment of prisoners sufficient to establish an Eighth Amendment violation.  *Rhodes*, 452 U.S. at 349 (The Constitution "does not mandate comfortable prisons.").

Even assuming that the meals Simpson was provided violated "the minimal civilized measure of life's necessities," *see Women Prisoners*, 93 F.3d at 928, he has failed adequately to allege that officials acted "with deliberate indifference to [his] health or safety."  Indeed, Simpson's complaint describes various attempts by prison officials to respond to his dietary complaints.  *See, e.g.,* Am. Compl., ECF No. 13-1 at 9 ("Defendant Montana ordered Plaintiff a vegan lunch meal upon Plaintiff's request."); *see also id*. at 12 ("On October 10, 2020, Nurse Gina spoke to an officer and persuaded him to order Plaintiff a vegan lunch meal.").

        b.     First and Fifth Amendment Municipal Liability

In *Monell v. New York City Dep't of Soc. Servs.*, the Supreme Court held that "municipalities and other local government units" are "persons" who may be sued under § 1983.  436 U.S. 658, 690 (1978).  On the other hand, "a municipality cannot be held liable under § 1983

on a *respondeat superior* theory." *Id*. at 691.  Instead, municipalities are liable for the conduct of their employees only if they acted "pursuant to official municipal policy of some nature [that] caused a constitutional tort." *Id*.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  Causation can be shown by demonstrating that a municipality's official policy was the "moving force behind the constitutional violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

A policymaker under *Monell* is an individual who "speak[s] with final policymaking authority" in the area of interest.  *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). This ensures that a municipality "is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *See Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997).  In the context of decisions concerning the day-to-day life of prisoners, wardens have sometimes been treated as policymakers for *Monell* purposes.  *See, e.g.*, *J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020).

In the present case, there are two related areas of interest:  the D.C. Jail's policies regarding requests for meal accommodations and its policies regarding requests for religious accommodations.  Simpson claims that Supervisory Chaplain Colbert and Warden Johnson are policymakers for the two areas of interest.  He supports this contention with a few allegations. For example, he alleges that medical staff told him they could not "put [him] on a special diet because '[t]his request has to go to the Chaplain.'" *See* Am. Compl., ECF No. 13-1 at 10.  He also alleges that he was told by a unit officer that Supervisory Chaplain Colbert "said she wasn't

6

going to place" him "on a religious diet." *Id*. at 12. And he alleges that his various requests were weighed and adjudicated by the Chaplain's Office, with all final appeals to be decided by the Warden.

The District argues that the fact that "Warden Johnson may review grievances does not render him a final policymaker, nor does the Chaplain's office review and granting of religious accommodations render Rev. Venson or Rev. Colbert policymakers." *See* Mot. to Dismiss., ECF No. 22 at 17 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986) ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.")); *but see Pembaur*, 475 U.S. at 281 ("If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood."). Perhaps at summary judgment,[1] the District can demonstrate that Warden Johnson and Supervisory Chaplain Colbert were not policymakers in the two areas of interest. But the amended complaint plausibly alleges that they were. Again, Simpson alleges that he was told by numerous employees to direct his food requests to the Chaplain's Office, which determined which religious requests could be accommodated and which could not. *See, e.g.*, Am. Compl., ECF No. 13-1 at 10 (alleging that when Simpson tried to raise his dietary issues during a sick call, he was told that medical staff could not "put [him] on a special diet because '[t]his request has to go to the Chaplain.'"). And he alleges that he received the Chaplain's decisions through

---

[1] The District has only moved to dismiss Simpson's First and Fifth Amendment claims against it, and has not attempted to demonstrate through facts outside the amended complaint's allegations that the Supervisory Chaplain and the Warden are not policymakers. Nor has it pointed to generally known facts to that same end.

formal written opinions that laid out general principles regarding how such requests were handled and were distinguishable from other religious accommodations that it had approved. *See id*. at 14. Drawing all reasonable inferences in his favor, Simpson has adequately alleged that the Supervisory Chaplain and Warden were both policymaker and decisionmaker.

But Simpson must also plausibly allege that policies of denying religious and meal accommodations were the "moving force[s]" behind his alleged constitutional violations. *Baker*, 326 F.3d at 1306. To this end, he argues that "the DC Jail's hiring practices, training, and supervision . . . allows for bigoted staff to freely discard the safety of the inmates under their control on the basis of their religion." Pl. Memo in Opp. to Mot. to Dismiss, ECF No. 23 at 2–3. He also argues that the D.C. Jail and its staff had a pattern and practice of deliberate indifference to his inability to eat, despite the relatively easy fix available to them. *Id*. at 1.

The District argues that the only evidence of the claimed policy (or policies) is Simpson's own treatment. Relying on *Connick v. Thompson*, the District argues that a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id*. (citing *Connick*, 563 U.S. at 64). In other words, it argues, Simpson was required to have pleaded that other inmates were similarly denied reasonable accommodations as a result of Defendants' policies.

There is something to this District's argument. *Monell* liability is only meant to attach to "action[s] for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479–80. The Supreme Court has therefore stressed that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. It is harder to make the requisite causal connection between a claimed policy and an alleged constitutional violation when the violation in question is a lone incident or a series of disparate,

isolated ones. Rather, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62. Anything less would convert *Monell* liability to mere *respondeat superior*.

But drawing all reasonable inferences in his favor, Simpson has pleaded such a pattern. Simpson alleges that he was denied reasonable religious accommodations on several occasions, including because the employees did not know the policy for deciding his requests. For example, Simpson alleges that despite requesting a vegan meal—which the D.C. Jail could have easily accommodated, and in fact later did accommodate—Simpson was given mac and cheese. *See* Am. Compl., ECF No. 13-1 at 9. When he complained to one of the doctors, Simpson asserts, he was told, "Just do what you can." *Id.* at 10. He also alleges that he often received circular responses to his requests for appropriate meals, with staff alternately pointing him to either the Chaplain or the medical office with no clear direction. To be sure, Simpson's amended complaint is limited to constitutional violations that allegedly happened to him. But one of Simpson's primary complaints was (and is) that he was being singled out for his faith, while members of more established religions were treated more fairly. At the pleading stage, where all facts must be read in the light most favorable to Simpson and all reasonable inferences drawn in his favor, it is plausible to claim that the D.C. Jail engaged in a pattern of denying Simpson vegan meals based, in part, on a failure to properly train staff about reasonably accommodating all religious practices.

   c.  *Common Law Tort Claims*

Turning to his common law tort claims against the District, Simpson failed to comply with D.C.'s notice requirement. Under D.C. law, "an action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant . . . has given notice in writing to the Mayor of the

9

District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage." D.C. Code § 12-309(a). "[C]ompliance with [§ 12–309] is mandatory as a prerequisite for filing suit against the District." *Gross v. District of Columbia,* 734 A.2d 1077, 1081 (D.C.1999).

The District argues that Simpson did not comply with these requirements. *See* Mot. to Dismiss, ECF No. 22 at 21; *see also* Decl. of Craven, ECF No. 22-2 at 3. Simpson counters that he delivered, without describing what he sent, notice "to the Mayor's office on April 19, 2021." *See* Pl. Opp. to Mot. to Dismiss, ECF No. 23 at 12. But even assuming this mailing contained appropriate notice, it was sent *after* Simpson filed suit on February 24, 2021. His common law negligence, gross negligence, intentional infliction of emotional distress, and "physical harm" claims against the District must be dismissed.

### B.     Warden Johnson

Turning to Warden Johnson, Simpson asserts RFRA and § 1983 claims arising out of the denial of five appeals lodged by Simpson with the Warden's office. *See* Am. Compl., ECF No. 13-1 at 16–17. Johnson, in turn, does not raise a qualified immunity defense. Instead, Johnson argues that Simpson fails adequately to allege that he was "directly involved in the wrongful acts." *See* Mot. to Dismiss, ECF No. 22 at 23. Johnson relies on several decisions holding that "a prison official's decision on an inmate grievance about an alleged constitutional violation does not itself render him personally liable." *Id*. at 24.

RFRA and § 1983 liability cannot rest on a *respondeat superior* theory, whether a person is sued in his official or personal capacity. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978); *see also Jones v. Horne*, 634 F.3d 588, 600 (D.C. Cir. 2011); *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). Simpson's "failure to intervene" theory, however, attempts to hold Warden

10

Johnson liable not for his own actions, but for the allegedly unlawful torts of his employees, and his RFRA and § 1983 claims against Johnson must be dismissed.

Simpson's common law claims have similar problems. Common law negligence can be shown by demonstrating "a duty of care owed by the defendant to the plaintiff, a breach of that duty by defendant, and damage to the interests of Plaintiff, proximately caused by the breach." *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C. 1984). Here, however, the amended complaint does not allege "that [Defendant Johnson] personally engaged in any action or committed any omission . . . or even that [Defendant Johnson] had any knowledge of [P]laintiff's predicament." *Tyson v. District of Columbia*, 20-cv-1450, slip op., 2021 WL 860263 (D.D.C. 2021) (dismissing negligence claim against Warden for alleged over-detention of inmate).

As for gross negligence, "courts have traditionally analyzed whether a defendant acted with gross negligence only in limited circumstances where gross negligence is a specific element of a claim or defense, or for equitable reasons." *Hernandez v. District of Columbia,* 845 F.Supp.2d 112, 116 (D.D.C.2012). Generally, where a plaintiff "has already alleged a negligence claim . . . the Court defers to the general rule in the District of Columbia against recognizing degrees of negligence and will dismiss as duplicative plaintiff's claim for gross negligence . . . as a separate basis of liability." *Id.* Here, Simpson already asserts a negligence claim against Johnson and does not identify any relevant statute that authorizes a gross negligence claim.

Lastly, Simpson alleges that Warden Johnson "intentionally inflicted emotional distress and physical harm," *see* Am. Compl., ECF No. 13-1 at 20, and illegally tortured him, *id*. at 33. To state a claim for intentional infliction of emotional distress, a plaintiff must allege: "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Minch v. District of Columbia*, 952 A.2d 929,

940 (D.C. 2008). Torture, in turn, requires allegations of "intentional infliction or threatened infliction of severe physical pain or suffering." *See* 18 U.S.C. § 2340(2)(A). But Simpson has not plausibly pleaded Warden Johnson was aware of his vegan meal requests, let alone acted intentionally to harm Simpson.[2]

### C.  Supervisory Chaplain Colbert and Chaplain Venson

Simpson asserts claims against Supervisory Chaplain Colbert and Chaplain Venson for conspiring to deprive him of his right to religious exercise by repeatedly denying his requests for accommodations. His complaint alleges that Colbert and Venson "conspired together to refuse to offer Plaintiff a religious diet." *See* Am. Compl., ECF No. 13-1 at 19. This is based on a conversation with Chaplain Venson in which Venson allegedly told Simpson that he and Supervisory Chaplain "already talked about [his] requests together and decided they were not going to provide [him] with religious accommodations." *Id.* at 21.

But Simpson does not allege an actual agreement between Colbert and Venon sufficient to trigger conspiracy liability. Instead his amended complaint contains only the most conclusory of allegations, failing to "allege the existence of any events, conversations, or documents indicating that there was ever an agreement or 'meeting of the minds' between any of the defendants to" deny him accommodations. *See McCreary v. Heath*, 04-cv-0623, 2005 WL 3276257, at *5–6 (D.D.C. Sept. 26, 2005). And even if Simpson had plausibly alleged such an agreement, Colbert and Venson were both employees of the Chaplain's Office and the intracorporate conspiracy doctrine therefore forecloses his Section 1985 conspiracy claim. *See Mehari v. District of Columbia*, 268 F. Supp. 3d 73, 80 (D.D.C. 2017) ("[D]istrict courts in this Circuit have consistently applied the

---

[2] Simpson has failed to state an Eighth Amendment claim against Warden Johnson for the same reasons he failed to do so with respect to the District. *See supra* at 4–5.

12

intracorporate conspiracy doctrine to Section 1985 conspiracy claims, like the one plaintiff attempts to allege here."); *see also Tabb*, 477 F. Supp. 2d at 190; *see also Tafler v. District of Columbia,* 05-cv-1563, 2006 WL 3254491, at *9–10 (D.D.C. 2006).

As for Simpson's claim for intentional infliction of emotional distress, he must plausibly allege that Colbert's and Venson's handling of Simpson's requests constituted "conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2010). The allegations in Simpson's complaint fall well short of that standard.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' Motion.[3] An Order will issue contemporaneously with this Opinion.

DATE: August 21, 2024

CARL J. NICHOLS
United States District Judge

---

[3] Colbert and Venson do not move to dismiss Simpson's negligence, RFRA, or § 1983 claims against them, apparently because of a footnote in the amended complaint stating that the "violation of 42 U.S.C. § 1985 only applies to Defendants Colbert and Venson. Plaintiff explicitly reserves the right to apply this violation to additional Defendants as more information becomes available." *See* Am. Compl., ECF No. 13-1 at 2, n.1. But the amended complaint asserts that all defendants "violated the First, Fifth, and Eighth Amendments of the United States Constitution, 18 U.S.C. § 2340, 42 U.S.C. § 1983 . . . and the RFRA," Am. Compl., ECF No. 13-1 at 2, and the footnote in question is merely stating that only Colbert and Venson are alleged to violate 42 U.S.C. § 1985.